FILED

UNITED STATES DISTRICT COURT

MAY 0 7 1999

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION


CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| NEAL ALLEN MORRIS, | \* | CIV 98-4118 |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| -vs- | \* | |
| | \* | |
| STATE OF SOUTH DAKOTA; SOUTH | \* | |
| DAKOTA STATE PENITENTIARY; | \* | MEMORANDUM OPINION AND |
| WILLIAM J. JANKLOW, Governor of | \* | ORDER DENYING IN PART |
| South Dakota; JEFF BLOOMBERG, | \* | AND GRANTING IN PART |
| Secretary of South Dakota | \* | MOTIONS FOR SUMMARY |
| Department of Corrections; | \* | JUDGMENT |
| DOUGLAS WEBER, Warden of the | \* | |
| South Dakota State Penitentiary; | \* | |
| ROBERT DOOLEY, Warden of the | \* | |
| Springfield Penitentiary; | \* | |
| KATHY THOMAS, Corrections | \* | |
| Secretary; JAMES HAAR, | \* | |
| Springfield contract attorney; | \* | |
| WILLIAM DELANEY, Sioux Falls | \* | |
| contract attorney; CYNTHIA | \* | |
| AHRENDT, Sioux Falls contract | \* | |
| attorney; and SOUTH DAKOTA | \* | |
| DEPARTMENT OF CORRECTIONS, | \* | |
| | \* | |
| Defendants. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | \* | |
| CHARLES SCHOLL, | \* | CIV 98-4068 |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| -vs- | \* | |
| | \* | |
| WILLIAM A. DELANEY, III, | \* | |
| Contractor; STEVE LEE, Deputy | \* | |

```
Warden; DOUGLAS WEBER, Warden,        *
SD State Penitentiary; JEFF           *
BLOOMBERG, Secretary of the           *
Department of Corrections;            *
WILLIAM JANKLOW, SD Governor,         *
                                      *
              Defendants.             *
                                      *
************************************    *
                                      *
LARRY A. EATON,                       *        CIV 97-4015
                                      *
              Plaintiff,              *
                                      *
      -vs-                            *
                                      *
WILLIAM J. JANKLOW, Governor of       *
the State of South Dakota;            *
JEFF BLOOMBERG, Secretary, South      *
Dakota Department of Corrections;     *
DOUG WEBER, Warden, South Dakota      *
State Penitentiary; ROBERT DOOLEY,    *
Warden, Springfield State Prison;     *
DARYL SLYKHUIS; MICHAEL               *
MULLER; and LEE KAUFENBERG,           *
                                      *
              Defendants.             *
                                      *
```

Pending before the Court are defendants' motions for summary judgment. (Docs.[1] 34 and 50.) The motions have been fully briefed by the parties and a hearing on the motions was held on May 3, 1999, with plaintiffs appearing by their attorney, Douglas E. Hoffman, and with defendants appearing by their attorneys, James E. Moore and William G. Beck. The Court will deny the motions in part and grant them in part as set forth below.

---

[1]Citations to "Doc." herein refer to documents filed in the lead case in this consolidated action, Morris v. South Dakota, CIV 98-4118 (D.S.D.), unless otherwise indicated.

2

I. Background

Plaintiffs are inmates confined by the State of South Dakota in either the South Dakota State Penitentiary ("SDSP"), located in Sioux Falls, South Dakota, or the Springfield State Prison ("SSP"), located in Springfield, South Dakota. The Court consolidated these actions which involve common questions of law and fact. The Court previously denied a motion to dismiss filed by defendants William Delaney, Cynthia Ahrendt and James Haar (hereinafter "contract attorneys"). (See Order Denying Motion to Dismiss, Doc. 40, (D.S.D. April 8, 1999)). The contract attorneys are attorneys-at-law who have contracted with the State of South Dakota to provide legal assistance to inmates confined in either the SDSP or the SSP.

The primary allegation in each of the complaints, brought pursuant to 42 U.S.C. § 1983, is that defendants have violated plaintiffs' constitutional right of access to the courts. Plaintiffs allege the contract attorneys' services and responsibilities toward inmates are limited to providing forms for habeas corpus petitions and civil rights actions involving the conditions of their confinement. No assistance is provided as to the substance or merits of any such claim. Plaintiff Morris alleges defendant James Haar refused to assist him in filling out the habeas corpus forms. The contract attorneys do not provide research assistance, assist with the preparation of briefs or make court appearances on behalf of inmates. Plaintiffs also allege the contract attorneys are at times inaccessible due to the number of inmates requesting to meet with them. Each plaintiff also states a claim for retaliation. Additionally, Scholl alleges 1) his legal mail has been illegally opened outside his presence; 2) the SDDOC policy requiring inmates to pay a medical co-payment for certain medical services is unconstitutional; and 3) the SDDOC policy regarding inmate trust accounts and financial responsibility is unconstitutional.

Defendants contend they are entitled to summary judgment on plaintiffs' access to the courts claims because the legal services provided by the contract attorneys are sufficient to satisfy inmates' constitutional rights of access to the courts. Defendants also claim no genuine issue of material fact exists for trial regarding plaintiffs' retaliation claims or any of Scholl's additional claims. Defendants contend that at the very least they are entitled to

3

qualified immunity on all claims because they have not violated any clearly established right of which a reasonable person would have known.

Inmates in the SDSP were allowed access to two law libraries until September 23, 1997. The main law library at the SDSP was located in the same space as the traditional library. There was a separate space in the Jameson Annex which served as a law library also. The law books at the SDSP were boxed up and have not been available to inmates since September 23, 1997. Defendant Haar testified that the SSP never had a law library, although inmates had access to and may continue to have access to the South Dakota Codified Laws and a prison self-help manual. (Haar Depo., Doc. 36, Exhibit C at 5 and 27.)

Defendant Jeff Bloomberg, Secretary of the South Dakota Department of Corrections ("SDDOC"), made the decision, with the approval of defendant William Janklow, Governor of the State of South Dakota, to close the law libraries in the SDSP. (Bloomberg Depo., Doc. 36, Exhibit D at 6 and 9.) The wardens of the correctional facilities were not seeking to close the law libraries. (Id. at 28-29.)

Defendant Douglas Weber, Warden of the SDSP, announced the closing of the law libraries at the SDSP in a memorandum dated September 23, 1997, which states as follows:

DATE:       September 23, 1997
TO:         Unit Management Staff Members
FROM:       Douglas L. Weber, Warden
RE:         Closing of Law Libraries

Effective this date the law libraries at both the penitentiary and the Jameson Annex are permanently closed.

The attorney, Mr. Michael McGreevy, who the Department of Corrections contracts with for providing inmates with legal access to the courts will continue in his position, however, he will provide assistance only in two areas:

1. "Conditions of Confinement" lawsuits where inmates allege in their pleadings that an agent, employee, or other officer of the South Dakota Department of Corrections is holding the inmate-plaintiff under circumstances or conditions that violate rights under the U.S. Constitution or the South Dakota Constitution; and

2. "Pleadings" which include petitions for writs of habeas corpus directed to either a federal or South Dakota court, and complaints in civil suits to be

4

> brought in either a federal or South Dakota court, and shall encompass all
> writs regarding decisions of the South Dakota Board of Pardons and Paroles.
> The term "pleadings" shall also encompass all affidavits, motions, orders, or
> like documents usually considered necessary to bring legally effective
> pleadings before a court, e.g., the filing of motions to proceed In Forma
> Pauperis for indigent inmates.

(Doc. 36, Exhibit A at 0002.)  This memorandum was clarified in a second memorandum

from Warden Weber dated September 29, 1997, which states:

> DATE:        September 29, 1997
> TO:          Unit Management Staff
> FROM:        Douglas L. Weber
> RE:          Clarification of legal advisor's duties
>
> The phrase "pleadings" in my September 23, 1997, memorandum does not
> include the preparation of legal brief or legal memorandum containing legal
> research.  Such pleadings are outside the scope of the responsibilities of the
> inmate legal advisor (contract attorney).
>
> The inmate legal advisor is limited to assisting inmates in preparing and
> filing adequate _initial_ pleadings in habeas corpus actions or in civil rights
> cases based on prison conditions.

(Doc. 29, Exhibit A.)

After the law libraries were closed, the inmates confined by the SDDOC had access

to the courts solely through assistance provided by the contract attorneys.  Defendant James

Haar has been a contract attorney at SSP since 1990.  Mike McGreevy was the contract

attorney at SDSP from approximately 1987 to November 1997. (McGreevy Depo., Doc. 46,

Exhibit 7 at 5-6.)  In November 1997, the SDDOC contracted with defendant William

Delaney to provide limited legal assistance to inmates confined in the SDSP.  (Delaney

Depo., Doc. 36, Exhibit F at 6.)  The SDDOC later contracted with defendant Cynthia

Ahrendt in the spring of 1998 to assist defendant Delancy in providing limited legal

assistance to inmates confined in the SDSP.  (Ahrendt Depo., Doc. 36, Exhibit E at 5.)

The contracts with the contract attorneys for the SDSP state in relevant part:

> Definitions.  The following definitions shall be applied in construing this
> contract:
>
> A. "Conditions of Confinement" lawsuits are those that allege in their
> pleadings that an agent, employee, or officer of the South Dakota Department
> of Corrections is holding the inmate-plaintiff under circumstances or

conditions that violate rights under the U.S. Constitution or the South Dakota Constitution.

B. "Pleadings" shall include petitions for writs of habeas corpus directed to either a federal or South Dakota court, and complaints in civil suits to be brought in either a federal or South Dakota court, and shall encompass all writs regarding decisions of the South Dakota Board of Pardons. The term "pleadings" shall also encompass all affidavits, motions, orders, or like documents usually considered necessary to bring legally effective pleadings before a court e.g., the filing of motions to proceed In Forma Pauperis for indigent inmates.

1.    Scope of Services.
      A. Legal Assistance. CONTRACTOR shall provide inmates of the SD State Penitentiary, Sioux Falls, South Dakota, with assistance in drafting pleadings, in the form of either petitions for writs of habeas corpus and/or complaints in lawsuits designed to test conditions of confinement at the SD State Penitentiary. CONTRACTOR duties shall also include lawsuits and petitions for writs of habeas corpus in which an inmate housed at the SD State Penitentiary alleges the South Dakota Board of Pardons & Paroles has denied parole in a manner violative of rights secured under the U.S. Constitution or the South Dakota Constitution.    Furthermore, CONTRACTOR shall only assist inmates in matters either: (a) grounded in fact and supported by legal arguments that are warranted by existing law; or, (b) that contain good faith arguments for the extension, modification, or reversal of existing law.  Photocopies made pursuant to this subparagraph shall be made at CONTRACTOR expense.  Use of DOC copiers will be billed at ten (10) cents per copy.
 . . . .
      B. Inmate Requests for Photocopies of Legal Material. CONTRACTOR shall screen inmate requests for photocopies of legal material to determine if such material is, in fact, legal in nature. Requests for material not legal in nature shall be returned by CONTRACTOR to the Facility for disposition. Material that is legal in nature shall be approved by the CONTRACTOR through signature on inmate commissary slip. Copies made pursuant to this subparagraph shall be at inmate expense at the rate of fifteen (15) cents per copy.

3.    Standard of Performance.    In performing under this contract, CONTRACTOR shall comply fully with the Rules of Professional Conduct of the South Dakota State Bar and the rules of federal and South Dakota Courts, as applicable.  CONTRACTOR shall render services under this contract commensurate with the services that would be rendered, under the same or similar circumstances, by the reasonably competent and skillful attorney practicing before local federal and state courts.

. . . .

8.   Time Frame of Services.   CONTRACTOR shall visit the SD State Penitentiary often enough to respond to inmate requests for legal assistance within a reasonable time of such requests being made in accordance with DOC rules.   CONTRACTOR ACKNOWLEDGES THAT TIMELY ATTENTION TO INMATES REQUESTING LEGAL ASSISTANCE IS OF THE ESSENCE.   EVERY REASONABLE EFFORT SHALL BE MADE BY CONTRACTOR TO RENDER REQUESTED SERVICES IN A TIMELY MANNER.

. . . .

10.   Monitoring Authority.   DOC may designate up to five (5) uncompensated persons (or other disinterested party or agency) to oversee CONTRACTOR performance under this contract.   CONTRACTOR shall promptly provide such monitoring authority with all materials reasonably necessary to ascertain the qualitative and quantitative nature of the legal services rendered by CONTRACTOR.   This clause shall not require the release of materials which would violate any attorney-client privilege existing between CONTRACTOR and any inmate client.   CONTRACTOR shall be informed in writing of the appointment of a monitoring authority.   This writing shall contain the names, business addresses, and business telephone numbers of all persons designated to serve as monitoring authorities, and shall specify who shall serve as the chairperson of the monitoring authority.

. . . .

13.   Conflict of Interest.   CONTRACTOR shall not be required to provide services under this contract to any inmate with whom a bona fide conflict of interest exists.   A bona fide conflict of interest does not exist until (1) relevant papers from a court of competent jurisdiction have been served, or a formal complaint has been filed with the South Dakota State Bar, and (2) the court or bar has made a preliminary determination that the action has merit.   CONTRACTOR shall notify DOC immediately of any such determination, and shall cooperate fully with any alternative legal representative designated by DOC to provide services within the scope of this contract.

(Doc. 36, Exhibit A at 0056-0077.) The contract with Haar is the same as the above quoted contract except that Haar provides his services to inmates at the SSP. (Id. at 0078-0088.)

Haar testified that once he determines what type of complaint an inmate has, he hands the inmate the appropriate form and tells the inmate if he needs additional help to request to see Haar again. (Haar Depo., Doc. 36, Exhibit C at 6-10, 14, 17.) Haar tells the inmate how to fill out the forms. (Id. at 8.) Haar does not help the inmates formulate the issues for their claims. (Id. at 16.) Haar does not assist inmates in filing notices of appeal from their criminal convictions. (Id. at 21-22). Haar provides photocopies of case law if the requesting

7

inmate has the funds in his inmate account to pay $.15 per page. (Id. at 19-20.) Haar visits
the SSP every other Wednesday and talks with 20 to 35 inmates during each visit. (Id. at
13.) Haar estimated 625 to 650 inmates are confined in the SSP. (Id.) He stated the SSP has
never had a law library, so his duties did not change much after the decision was made to
close the law libraries in the SDSP. (Id. at 5.) Prior to 1997 Haar did civil work for inmates,
including divorces. (Id.) The new contracts, however, prohibit the contract attorneys from
performing that type of civil work. (Id.) Haar testified he is an independent contractor and
does not report to anyone. (Id. at 22.) Although Haar's contract with the SDDOC provides
for a committee of overseers, the committee has not been created. (Id. at 22.)

Ahrendt testified she and Delaney answer to Bloomberg, the Secretary of the
SDDOC. (Ahrendt Depo., Doc. 36, Exhibit E at 26.) Ahrendt was not able to give a close
estimate of the number of hours she works on her contract with the SDDOC, but she said she
usually can commit two to three days per week to fulfill her duties under the contract. (Id.
at 27-33.) Ahrendt does not copy case law for inmates at the SDSP, even if the inmate has
a list of the cases he wants copied. (Id. at 45.) An inmate requesting copies of case law is
referred to Dave Schiefen, SDSP's policy analyst. (Id.) Ahrendt does not assist inmates in
filing notices of appeal from their criminal convictions because she believes her contract with
the SDDOC prohibits her from filing such notices. (Id. at 26.)

Delaney testified he is paid for working 16 hours per week under his contract with
the SDDOC, but he actually works approximately 30 hours on a "slow week" on this
contract. (Delaney Depo., Doc. 36, Exhibit F at 7, 36.) Delaney believes his job is to "get
the inmate from the penitentiary, figuratively speaking, into court, you know. Once they're
in court, once the Pleadings or whatever are filed, then that's the end of it for us." (Id. at 11.)
Delaney explained he does more than help inmates with their specific litigation needs; for
example, he and Ahrendt have met with the parole board to discuss general issues involving
many inmates in the SDSP. (Id.) Regarding § 1983 claims, Delaney generally hands the
inmate a form and requests him to fill out the form, using the form as a screening device.
(Id. at 16-17.) If a claim looks like a "real meritorious claim," Delaney will prepare the §
1983 complaint himself. (Id.) Delaney will prepare a state habeas petition for an inmate
after the inmate fills out a questionnaire. (Id. at 20.) For federal habeas petitions, Delaney

8

tends to use the forms, but he generally prepares the issues himself because inmates have "a hard time really articulating the issues very well." (Id. at 20-21.) Delaney does not file direct appeals from criminal convictions for SDSP inmates. (Id. at 53.) Delaney does not believe having a law library available would assist him in his job regarding civil rights and habeas cases, because "the inmates that would probably use the law library wouldn't want [the contract attorneys'] services anyway ...." (Id. at 44.)

It does not appear from the record herein that the contract attorneys are providing legal assistance to any of the plaintiffs because of the obvious conflict of interest with the present case, wherein the contract attorneys are named as defendants. (See, e.g., Doc. 36, Exhibit A at 0065, 0076, 0087.) Moreover, since March 5, 1998, the contract attorneys have not provided any legal assistance to plaintiff Scholl because he filed a grievance against Delaney with the State Bar of South Dakota. In addition to plaintiffs, the contract attorneys no longer provide access to the courts to inmates Thomas Pelligrino and Roger Raymond. (Delaney Depo., Doc. 36, Exhibit F at 24-25.) Schiefen is responsible for deciding whether inmates not working with a contract attorney may obtain copies of their legal work. (Id. at 20-21.) However, Schiefen does not authorize inmates to receive copies of case law. (Id.) Although the contracts with the contract attorneys requires them to cooperate with an alternative legal representative in the event of a conflict of interest (Doc. 36, Exhibit A at 0065, 0076, 0087), the SDSP does not have an alternative plan to assist inmates in obtaining access to the courts if the contract attorneys are prohibited from or refuse to provide legal services to any specific inmate. (Schiefen Depo., Doc. 36, Exhibit B at 23-24.)

## II. Decision

Summary judgment is appropriate if the moving party establishes that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256 (1986). In reviewing a motion for summary judgment, this Court views the evidence in a light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'"

Commercial Union Ins. Co. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992) (quoting Fed.R.Civ.P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted). Plaintiffs have clearly alleged violations of rights secured by the Constitution and laws of the United States. It is also clear all defendants, other than perhaps the contract attorneys, have acted under color of state law. Id. at 49-50 (stating "generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."). As to the contract attorneys, the Court concludes below a genuine issue of material fact remains for trial on the issue of whether they have acted under color of state law.

A.   Qualified Immunity

Government officials performing discretionary tasks are entitled to qualified immunity protecting them from liability for civil damages unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Anderson v. Creighton, 483 U.S. 635, 639 (1987) (holding "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken."); Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."). "In order for a person to have a clearly established right, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Mahers v. Harper, 12 F.3d 783, 785 (8th Cir. 1993) (quoting Anderson, 483 U.S. at 640). The Eighth Circuit explained "[q]ualified immunity guards against the injustice of subjecting public officials to damage liability for the good faith performance of discretionary duties they are legally obligated to undertake,

10

and the danger that the threat of such liability will deter officials from performing with the decisiveness and judgment the public good requires." King v. Beavers, 148 F.3d 1031, 1034 (8th Cir.) (citing Scheuer v. Thodes, 416 U.S. 232, 241-42 (1974)), cert. denied, 119 S.Ct. 513 (1998).

It appears from the record in this case that the decision to close the law libraries at the SDSP was made by Bloomberg, Secretary of the SDDOC, with the approval of Governor Janklow.  (Bloomberg Depo., Doc. 36, Exhibit D at 6 and 9.)  Although the remaining defendants followed Bloomberg's directives regarding closure of the law libraries, they did not actively participate in the ultimate decision regarding how the SDDOC would satisfy inmates' rights of access to the courts.  Bloomberg testified in his deposition he first started thinking about changing the procedures for inmates' access to the courts following a seminar he attended in Atlanta, Georgia, hosted by the National Association of Attorneys General.  (Id. at 5-6.)  Upon returning from the seminar he began discussing the subject of inmate access to the courts with his staff and "looking seriously" at the system the State of Utah had implemented to provide its inmates with access to the courts.  (Id. at 6.)  The primary reason Bloomberg felt the system with the law libraries was not working correctly was the logistics for the staff of the prison.  (Id.)  Bloomberg was concerned with being able to provide equal services to the inmates regardless of the correctional facility in which they were confined.  (Id. at 6-7.)  Bloomberg believed eliminating the law libraries at the SDSP would eliminate some of the cost of providing inmates access to the courts.  (Id. at 8.)  However, eliminating the law libraries did not truly reduce the cost of providing such access.  (Id. at 8.)  While Bloomberg was considering whether to close the law libraries, he researched the requirements needed to satisfy inmates' constitutional rights of access to the courts.  (Id.)  He reviewed the Supreme Court's decisions in Bounds v. Smith, 430 U.S. 817 (1977) and Lewis v. Casey, 518 U.S. 343 (1996) in making his decision.  (Bloomberg Depo., Doc. 36, Exhibit D at 8-9.)  Bloomberg understands the contract attorneys' jobs are to "make sure that those individuals who have valid legal concerns have the opportunity and access to either the state or the federal courts for their 1983 and their confinement cases and their habeas corpus."  (Id. at 11-12.)  In response to a question regarding the timeliness of services provided by the contract attorneys, Bloomberg stated he believes the quickest way to get

11

access to the courts is with the assistance of an attorney. (Id. at 14-15.)  He believes even if the inmates have a "stack of books, they're going to need somebody to help them interpret that for them." (Id. at 14-15.)

In Bounds, the Supreme Court stated "we encourage local experimentation" in various methods of assuring access to the court. 430 U.S. at 832.  The Supreme Court later explained in Lewis:

> One such experiment, for example, might replace libraries with some minimal access to legal advice and a system of court-provided forms such as those that contained the original complaints in two of the more significant inmate-initiated cases in recent years, Sandin v. Conner, 515 U.S. 472 (1995), and Hudson v. McMillian, 503 U.S. 1 (1992) - forms that asked the inmates to provide only the facts and not to attempt any legal analysis.  We hardly think that what we meant by "experimenting" with such an alternative was simply announcing it, whereupon suit would immediately lie to declare it theoretically inadequate and bring the experiment to a close.  We think we envisioned, instead, that the new program would remain in place at least until some inmate could demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded.

518 U.S. at 352-53 (footnotes omitted).

The Court concludes that when Bloomberg and Governor Janklow made the decision to close the law libraries at the SDSP and continue providing legal assistance to inmates via contract attorneys, they were engaging in the "experimentation" approved by the Supreme Court in Bounds, supra, and Lewis, supra.  Although, as explained below, plaintiffs have survived summary judgment and they may demonstrate at trial that a nonfrivolous legal claim has been frustrated or impeded, the Court cannot say Bloomberg's and Governor Janklow's actions violated clearly established constitutional rights of which a reasonable person would have known.  Harlow, 457 U.S. at 818 (standard for granting qualified immunity).  At the time Bloomberg and Governor Janklow made the decision at issue, inmates' had a clearly established constitutional right of access to the courts. Bounds, 430 U.S. at 817.  However, the legal rules regarding the manner in which that right had to be satisfied were not "clearly established" at the time the decision was made to close the law libraries at SDSP.  Therefore, although the plaintiffs may ultimately prevail in proving denial of access to the courts, Bloomberg and Governor Janklow are entitled to qualified immunity. See Anderson, 483 U.S. at 639 (explaining standard for qualified immunity); Malley, 475

12

U.S. at 341 (same); see also Mathis v. Sauser, 942 P.2d 1117, 1125 (Alaska 1997) (reversing lower court's entry of summary judgment in favor of prison officials on access-to-the-courts claim on the request for declaratory and injunctive relief, but affirming the grant of qualified immunity for civil damages based on the recognition that federal and state courts had upheld rules intended to make access to the courts more difficult for inmates).

Although defendants Warden Weber, Robert Dooley as Warden of the SSP, Kathy Thomas, Steve Lee as Deputy Warden of the SDSP, Daryl Slykhuis, Michael Muller, and Lee Kaufenberg may have participated in closing the law libraries at the SDSP or are otherwise involved in carrying out SDDOC's policies regarding inmates access to the courts, they were not involved in making the decision to close the law libraries or deciding how the SDDOC would satisfy inmates' rights of access to the courts. The Court concludes just as Bloomberg and Governor Janklow are entitled to qualified immunity for making the decision regarding inmate access to the courts, the defendants listed immediately above are entitled to qualified immunity on plaintiffs' claims for damages for violation of their constitutional rights of access to the courts.

The contract attorneys continue to assert that they have not acted under color of state law and therefore are not subject to suit under 42 U.S.C. § 1983. In the alternative, they assert if the Court concludes they have acted under color of state law, they are entitled to qualified immunity on the same basis as the other defendants in this action. The Court concludes genuine issues of material fact remain for trial regarding whether the contract attorneys acted under the color of state law in the provision of legal services to inmates confined in the SDSP and SSP. Based upon the record herein, the Court concludes genuine issues of material fact exist as to whether the contract attorneys are advocates "wholly independent of the government," Polk County v. Dodson, 454 U.S. 312, 327 (1981) (Burger, C.J., concurring), such that they are exercising "'independent professional judgment,'" Eling v. Jones, 797 F.2d 697, 699 (8th Cir. 1986), (quoting Polk County, 454 U.S. at 324), cert. denied, 480 U.S. 917 (1987). (See Order Denying Motion to Dismiss, Doc. 40.)

The Court will assume the contract attorneys acted under color of state law in determining whether they are entitled to qualified immunity herein. The Court concludes

13

the contract attorneys are entitled to qualified immunity herein for the same reasons set forth above in concluding Bloomberg and Governor Janklow are entitled to qualified immunity.

Although the Court does not find the defendants' actions were reasonable in light of the severe restrictions placed upon SDDOC inmates' abilities to access the courts, the Court believes these defendants are entitled to qualified immunity on plaintiffs' claims for damages in light of the Supreme Court's encouragement to engage in "experimentation" regarding various methods to satisfy inmates' rights of access to the courts. Lewis, 518 U.S. at 352-53; Bounds, 430 U.S. at 832.

B.    Access to the Courts Claims in Defendants' Official Capacities

The Supreme Court's most recent decision involving prison inmates' right of access to the courts is Lewis, 518 U.S. at 343. In explaining the actual injury requirement to show a violation of an inmate's right of access to the courts, the Supreme Court explained:

> The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. .... It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presentation of claims will not occur.

Lewis, 518 U.S. at 349. The Supreme Court explained Bounds did not establish a right to a law library or legal assistance; rather, Bounds acknowledged the already well-established right of access to the court. Id. at 350. The Supreme Court further explained:

> Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. .... Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," [Bounds, 430 U.S.] at 823 (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

14

Lewis, 518 U.S. at 351.

The Court will examine each individual plaintiff's claim to determine whether a genuine issue of material fact exists regarding the actual injury requirement discussed above.

### 1. Plaintiff Neal Morris

The following factual information was obtained from Morris' Amended Complaint, Doc. 14, which was incorporated in his Affidavit, Doc. 43, filed in opposition to defendants' summary judgment motion. Morris entered the SDSP on January 13, 1998 and he immediately began requesting to consult with a contract attorney to determine what he needed to do to file a direct appeal from his criminal conviction. He was transferred to the SSP on January 29, 1998 without having met with a contract attorney. Morris continued to seek a consultation with a contract attorney while at SSP. Morris had been informed that the deadline to file a direct appeal from his criminal conviction was February 12, 1998. Therefore, on February 10, 1998 Morris filed a Notice of Appeal without consulting with or receiving any type of legal assistance from a contract attorney. After the Notice of Appeal was filed, Morris met with James Haar at SSP and showed Haar the notice and addresses to which Morris had sent his notice. Haar informed Morris the notice would work and therefore Haar could not provide any additional assistance. Morris received an application for court-appointed attorney on March 21, 1998, although the letter was postmarked over a month earlier on February 17, 1998. He immediately filled it out and returned it to the state court. Morris later learned from public defender Staci Naugle that his Notice of Appeal was in the wrong format, that one copy was sent to the wrong address and because of his lack of responding to the application for court-appointed counsel in a timely fashion, Morris missed his time limit to appeal. Morris contends his direct appeal was defaulted "because of his inability to navigate the procedural maze of the appeal and scheduling process[, which resulted] in a procedural default barring consideration of a habeas action in federal court." (Doc. 14 at 5.)

After learning he had defaulted his direct appeal, Morris consulted with Haar, during which meeting Haar said he would send Morris a writ of habeas corpus form to fill out. Morris received the forms, but found them very overwhelming and again requested to see Haar. When Morris met with Haar after receiving the forms, Morris asked Haar to assist him

15

in filling out and filing the forms.  Haar said he could not assist Morris because he had already done all that his charter with the State allowed him to do.  In his deposition, Haar testified his notes reflect he did assist Morris, but he could not remember what type of assistance he provided to Morris.  (Haar Depo., Doc. 36, Exhibit C at 11-12 and 14-15.) Haar acknowledged he does not assist inmates in filing notices of appeal from their criminal convictions.  (Id. at 21-22.)

On May 7, 1998 Morris was transferred to the SDSP.  Morris had a meeting with Cynthia Ahrendt on May 8, 1998.  Morris informed Ahrendt of what had transpired in his criminal case.  Ahrendt gave Morris more forms to complete for a writ of habeas corpus, telling him that he had a very good case.  Ahrendt told Morris to request to meet with her again when Morris had the forms filled out.  Morris said he would fill the forms out that night and would put in a request to meet with her that night as well.  Ahrendt informed him she would be back to the SDSP the following week to collect the forms to enable her to file a writ of habeas corpus.  Ahrendt did not meet with Morris again and Morris has been requesting to consult with her since May 8, 1998 to no avail.

During her deposition, Ahrendt testified she saw Morris for the first time on May 7, 1998.  (Id. at 7.)  During this consultation, Ahrendt gave Morris some forms and a questionnaire to fill out and told him to mail them back to her so she could evaluate them before they had another meeting.  (Id. at 7-9.)  Ahrendt saw Morris in the hallway again in May 1998 and she told him again to fill out the questionnaire and mail it back to her.  (Id. at 10-11.)  Morris did not send Ahrendt the paperwork she requested him to complete.  (Id. at 12.)  Ahrendt never received the questionnaire or any of the forms she requested Morris to complete, so she did not schedule another appointment with him.  (Id. at 9-19.)  Ahrendt claims Morris did not tell her about his problems in getting his Notice of Appeal filed on time.  (Id. at 15.)  Ahrendt denied informing Morris he had a good habeas case; rather she may have said he had a good § 1983 claim regarding inadequate medical care for his back and leg.  (Id. at 12 and 15.)  Ahrendt does not file Notice of Appeal documents relating to inmates' direct appeals from their criminal convictions, because she said "I don't think we're allowed to do that."  (Id. at 26.)  Morris filed the current action against Ahrendt in July 1998.

During his deposition, Delaney testified he received his first "kite"[2] from Morris on January 14, 1998. (Delaney Depo., Doc. 36, Exhibit F at 46.) Delaney received two more kites on January 22 and 27, 1998, on which Morris indicated he had an appeal issue, although Delaney did not receive these kites immediately. (Id. at 46.) When Delaney received the kites with "appeal" written thereon he "started paying attention to that," and the next time Delaney was at the SDSP on March 10, 1998, he tried to find Morris. (Id.) However, Morris had already been sent to SSP. (Id.) Delaney next saw Morris in February 1998 when Morris walked into Delaney's office "hooting and hollering." (Id. at 47.) Delaney deals with "problem children" like Morris by visiting with them right away rather than telling them to come back another time. (Id.) Morris informed Delaney of the problems with his direct appeal. (Id. at 48.) Delaney informed Morris filing a state habeas was the best course of action. (Id. at 49-50.) Morris again "slipped in" to see Delaney on June 8, 1998. (Doc. 14 at 4.) Delaney informed Morris that Ahrendt was now handling Morris' case and Ahrendt would be at the SDSP to see Morris the next week. Morris filed the present lawsuit against Delaney in July 1998.

Despite repeated requests, Morris has not consulted with or received any legal assistance from a contract attorney since June 8, 1998. Morris filed an application for writ of habeas corpus, pro se, on August 23, 1998. Morris has no access to legal reference materials or legal advice. Morris desired to file an appeal of an adverse parole decision but has not received notice of entry of the decision and has no ability to perfect an appeal without access to a law library and/or the assistance of counsel. In addition, Morris suffered a severe back injury while incarcerated and he claims defendants have been deliberately indifferent to his serious medical needs. Morris contends he is unable to commence a civil rights action to obtain needed medical care without access to a law library and/or assistance of counsel, both of which he is denied.

The Court finds genuine issues of material fact remain for trial regarding Morris' claim that he has been denied access to the courts. There is a genuine issue of material fact

---

[2]A "kite" is a written form completed by an inmate confined in the SDSP to request an appointment with a contract attorney.

regarding whether Morris suffered actual injury, as defined in <u>Lewis</u>, 518 U.S. at 351, from the default of the direct appeal from his criminal conviction, from being unable to file a complaint pursuant to 42 U.S.C. § 1983 regarding inadequate medical care and from being unable to appeal an adverse decision by the parole board.  The Court will deny defendants' summary judgment motions in defendants' official capacities on Morris' access to the courts claim.

### 2.  Plaintiff Charles Scholl

The following factual information regarding Scholl's claims is derived from his Complaint, Doc. 1 in CIV 98-4068, which is incorporated in his Affidavit, Doc.44 in CIV 98-4118, submitted in opposition to defendants' summary judgment motion.  The claims include that Delaney stalled for over three months and then refused to provide Scholl any assistance or even communicate with Scholl;  Delaney refused to provide Scholl with copies of legal statutes or legal references;  Delaney refused to read Scholl's information or prepare an initial draft of Scholl's application for writ of habeas corpus;  Delaney also refused to assist Scholl in preparing any actions against the SDSP regarding the conditions of his confinement;  Delaney's refusal to provide legal assistance to Scholl caused Scholl to miss deadlines and statutes of limitations for filing actions; and that Delaney will no longer provide legal assistance to Scholl because Scholl filed a grievance against him with the State Bar of South Dakota.

During his deposition, Delaney testified Scholl was one of the first inmates Delaney met with when he began as a contract attorney in November 1997. (Delaney Depo., Doc. 36, Exhibit F at 59.)  Delaney consulted with Scholl on at least five different occasions between November 1997 and March 5, 1998.  (<u>Id.</u> at 59, 63.)  Scholl showed Delaney the habeas petition Scholl had written, but Delaney said the petition was incomprehensible and Delaney informed Scholl he was not going to get anywhere with the petition as written.  (<u>Id.</u> at 60.) Delaney then sent federal habeas forms to Scholl for completion, but he never completed the forms.  (<u>Id.</u> at 61.)  Delaney said Scholl never did anything Delaney asked him to do.  (<u>Id.</u> at 61, 64 and 70.)  On March 5, 1998, Delaney learned Scholl filed a grievance against Delaney with the State Bar of South Dakota.  (<u>Id.</u> at 63.)  Following the filing of the grievance with the State Bar, neither Delaney nor Ahrendt has provided legal services to

18

Scholl. (Id. at 65-66; Schiefen Depo., Doc. 36, Exhibit B at 22,and 24-25; Doc. 46, Exhibit 17 at 1695.)

The Court has taken judicial notice of Scholl's pro se application for writ of habeas corpus filed with this Court on August 5, 1998. Scholl v. Weber, CIV 98-4137 (D.S.D.). The Court recently dismissed Scholl's habeas action because it was barred by the one-year statute of limitations set forth in 28 U.S.C. § 2244(d). Id., Order Denying Petition for Writ of Habeas Corpus, Doc. 16 (D.S.D. April 28, 1999). The Court finds genuine issues of material fact remain for trial regarding Scholl's claim that defendants violated his constitutional right of access to the courts. There is a genuine issue of material fact regarding whether Scholl suffered actual injury, as defined in Lewis, 518 U.S. at 351, relating to his application for a writ of habeas corpus and his claim that he is incarcerated under unconstitutional conditions of confinement. The Court will deny defendants' summary judgment motions in defendants' official capacities on Scholl's access-to-the-courts claim.

### 3.  Plaintiff Larry Eaton

Plaintiff Larry Eaton has been confined in both the SDSP and the SSP at various times relevant to this lawsuit. As of April 12, 1999 Eaton was confined in the SSP. (Eaton Affidavit, Doc. 45 at 2.) Eaton contends that lack of a law library at the SSP and the inadequate legal assistance provided by Haar have denied him access to the courts. Eaton states the defendants' actions have hindered his efforts to pursue legal claims attacking his sentence and the conditions of his confinement. (CIV 97-4015, Amended Complaint, Doc. 25 at 3.) Eaton contends the limitation on Haar's duties imposed by the State prohibiting Haar from providing any assistance beyond the drafting of an initial pleading to commence an action for habeas corpus or a civil rights claim violates his right of access to the courts. Eaton contends Haar merely provides inmates with a generic form to be filled out by the inmate, refusing to draft even the initial pleading unless Haar views an inmate's grievance as potentially meritorious.

The Court has taken judicial notice of the various actions filed by Eaton in this Court. Eaton is a frequent litigator who files claims on his own behalf and also assists other prisoners with their legal needs. (See CIV 97-4015, Doc. 1 at 3 and attached Affidavit.) The Court will separately address each action filed by Eaton in this Court. In Eaton v. Delano,

CIV 95-4045 (D.S.D.), Eaton claimed defendants violated several of his constitutional rights by denying him admission to a rehabilitative program for inmates.  The Honorable John B. Jones, U.S. District Judge, granted summary judgment in favor of defendants on August 26, 1996 (CIV 95-4045, Doc. 41), which decision was affirmed on appeal by the Eighth Circuit on March 27, 1998.  Although Eaton was incarcerated in the SSP with no access to a law library at the time the complaint and amended complaint were filed in CIV 95-4045, Eaton had been transferred to the SDSP at the time the motions for summary judgment were filed in July 1996.  The law libraries at the SDSP were not closed until September 23, 1997. Eaton submitted a response to the summary judgment motions.  Eaton never filed a motion for appointment of counsel in CIV 95-4045.  Eaton clearly had access to the courts in connection with CIV 95-4045 under the standard announced by the Supreme Court in Lewis, 518 U.S. at 351.  Although Eaton lost on the merits of his complaint, there is no genuine issue of material fact that any alleged shortcomings in the law library or legal assistance program hindered his efforts to pursue this legal claim.  See id.

A second action filed by Eaton was Eaton v. Jacobson, CIV 95-4105 (D.S.D.), wherein he sued several members of the parole board.  Eaton set forth his claims in a pro se complaint filed on May 30, 1995.  However, Eaton apparently retained attorney Lee C. "Kit" McCahren following the filing of defendants' motion to dismiss.  Attorney McCahren responded to defendants' motion to dismiss on behalf of Eaton.  Although this action was dismissed on November 6, 1995 for failure to state a claim upon which relief may be granted due to absolute immunity, it is clear Eaton had access to the courts in connection with CIV 95-4105 under the standard announced by the Supreme Court in Lewis, 518 U.S. at 351.

The third action filed by Eaton was Eaton v. Gerdes, CIV 96-4245 (D.S.D.).  Eaton's Amended Complaint was filed on January 16, 1997.  Eaton brought this § 1983 action claiming attorney William Gerdes failed to perform his duties as counsel for Eaton in a criminal matter in Brown County, South Dakota, thereby depriving Eaton of his civil and constitutional rights to counsel and due process of law.  Gerdes filed a motion to dismiss contending his actions were not done under color of state law and therefore Gerdes was not subject to suit under 42 U.S.C. § 1983.  Eaton submitted a brief in opposition to Gerdes' motion to dismiss.  The action was dismissed on October 27, 1997 because Gerdes, as

20

Eaton's court-appointed attorney in a criminal matter, was not subject to suit under § 1983. (CIV 96-4245, Doc. 21.) Eaton did not request appointment of counsel in CIV 96-4245. Although Eaton did not prevail on the merits in CIV 96-4245, Eaton clearly had access to the courts in connection with this claim under the standard announced by the Supreme Court in Lewis, 518 U.S. at 351. Therefore, CIV 96-4245 cannot be the basis for a finding of actual injury required to prevail on a claim that defendants violated his right of access to the courts.

Eaton filed a federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on July 18, 1997. Eaton v. Weber, CIV 97-4152 (D.S.D.). Eaton supplemented his original petition with several documents throughout 1997, even after he no longer had access to a law library. Eaton has not specified how CIV 97-4152 was hindered by any of the defendants' actions. In a letter to Attorney Hoffman, Eaton stated in reference to his § 2254 petition in CIV 97-4152, "[t]here is no doubt, if I had access to a law library, I could of properly present[ed] my issues before the court, which are (1) at the time of my guilty plea, I was not in a state of mind to present a guilty plea (2) my court appointed attorney was ineffective (3) the court did not comply with the plea agreement, and failed to give me an opportunity to withdraw my plea." (Doc. 46, Exhibit 14.) Contrary to Eaton's opinion, these claims were fully presented in Eaton's § 2254 petition and the Court considered his claims on the merits. Although Eaton did not prevail on his § 2254 petition, there is no genuine issue of material fact that the "alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." Lewis, 518 U.S. at 351. Therefore, CIV 97-4152 cannot serve as the basis for a finding of actual injury required to prevail on a claim that defendants violated his right of access to the courts.

Eaton is a plaintiff in an action pending before the Honorable John B. Jones, Werner v. Bloomberg, CIV 97-4191 (D.S.D.), brought pursuant to 42 U.S.C. § 1983. The plaintiffs in CIV 97-4191 are claiming their constitutional rights have been and are currently being violated by the enforcement of SDDOC's policy 1B.10 regarding "Inmate Accounts Financial Responsibility," by the imposition of a medical co-payment pursuant to SDDOC's policy 4E.18, by high commissary prices and by removal of the law library from the SDSP. Eaton has perfected two appeals to the Eighth Circuit from decisions of the district court.

(CIV 97-4191, Docs. 22 and 65.)  Eaton has not alleged how he has been hindered in pursuing his claims in CIV 97-4191.  Therefore, Eaton cannot survive summary judgment in the present action based on any actual injury allegedly suffered in CIV 97-4191.

Defendants have made and supported their motions for summary judgment.  Eaton now has an obligation to go beyond his pleadings and by affidavit or otherwise designate "specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e).  Eaton filed an affidavit, Doc.47, incorporating many documents filed in this case.  One of those documents is a letter to Attorney Hoffman dated March 31, 1999, wherein Eaton states he has 28 legal reference books and is currently enrolled in a paralegal/legal assistance course.  (Doc. 46, Exhibit 12.)  He states the officials at the SSP have advised him that he is only allowed to have ten books in his possession and that he might be required to send the remaining eighteen out of the SSP.  (Id.)  It appears Eaton objects to being deprived of these books primarily because he will be hindered in his efforts to assist other inmates with legal claims in that Eaton requested Attorney Hoffman to "[p]lease do what you can to help me keep my books, as I need them to assist others, because James Haar, won't."  (Id.)

Haar testified in his deposition that Eaton has not asked Haar to complete or assist in completing any civil rights forms or habeas forms for Eaton.  (Haar Depo., Doc. 36, Exhibit C at 10-11.)  Haar, however, does provide photocopies of case law for Eaton.  (Id. at 11, 19-20.)

During his deposition, Delaney stated he visited with Eaton on November 25, 1997.  (Delaney Depo., Doc. 36, Exhibit F at 78-79.)  Eaton wanted to discuss his federal lawsuit involving the law library, which had already been filed by the time Eaton consulted with Delaney.  (Id. at 79.)  Delaney informed Eaton that he could not assist Eaton because the case had already been filed.  (Id.)  The only other contact Delaney had with Eaton occurred when Delaney received a letter dated February 15, 1998, wherein Eaton requested copies of a string of cases.  (Id.)  Delaney responded in writing informing Eaton that Delaney could not provide copies of the requested cases and that was the extent of the contact between Delaney and Eaton.  (Id.)

The Court has thoroughly reviewed the documents incorporated in Eaton's affidavit, Doc. 47, and does not find any "specific facts showing that there is a genuine issue for trial."

Fed.R.Civ.P. 56(e).  Eaton does not state any specific facts to show he was hindered in pursuing a legal claim, as defined in Lewis, 518 U.S. at 351, by any alleged deficiencies in the manner chosen by SDDOC to satisfy inmates' right of access to the courts.  Therefore, the Court will grant defendants' motions for summary judgment as to Eaton's claim of denial of his right of access to the courts as set forth in CIV 97-4015.

C.    Photocopies of Legal Documents

Scholl contends in his complaint he has no access to photocopies of legal documents or exhibits to properly communicate with the courts or attorneys.  (CIV 98-4068, Doc. 1 at 4.)  He contends the lack of access to legal photocopies has caused him to miss filing dates. (Id.)  The South Dakota Supreme Court has returned his pleading because he could not provide the proper number of legal photocopies and he has not been able to properly support or present his pleadings because he could not provide the required photocopies of his documents to the courts.  (Id.)  The statements in Scholl's complaint were incorporated in his affidavit submitted in opposition to defendants' summary judgment motion.  (Doc. 44.)

As of April 16, 1998, Warden Weber apparently took the position that Scholl was not entitled to copies of legal documents because "[l]egal access was provided to [Scholl] and [Scholl] abused it."  (Doc. 46, Exhibit 17 at 1693-95.)  At some time, Schiefen made the decision to allow Scholl to obtain copies of legal documents because as of March 1, 1999, the date of Schiefen's deposition, Schiefen was seeing Scholl on a weekly basis to provide legal copies, although copies of legal authorities are not provided to Scholl or any other inmate at SDSP.  (Schiefen Depo., Doc. 36, Exhibit B at 19-22.)

The Court finds a genuine issue of material fact exists for trial regarding Scholl's claim that defendants' refusal to provide photocopies of his legal documents, in addition to Scholl's claims discussed above, have violated Scholl's right of access to the courts. Delaney and Schiefen acknowledge Scholl is no longer allowed to meet with any contract attorney and is not allowed to obtain copies of legal authorities from SDSP officials.  The Court will deny defendants' motions for summary judgment on Scholl's claim regarding legal photocopies in defendants' official capacities.  The Court concludes, however, defendants are entitled to qualified immunity on this claim.  See Anderson, 483 U.S. at 639 (explaining standard for qualified immunity); Malley, 475 U.S. at 341 (same).

23

Eaton alleges in his Amended Complaint, Doc. 25 in CIV 97-4015, that the prison system will provide him with photocopies of legal research materials only on a limited basis as approved by the contract attorney and at a cost of $.15 per page. However, Eaton did not dispute defendants' statement of material fact that "Eaton has not been denied photocopies while at Springfield." (Doc. 36 at ¶ 38; Doc. 46 at 11.) The Court does not find a genuine issue of material fact for trial regarding Eaton's photocopy claim.

Morris states the same claim as Eaton regarding photocopies. (Doc. 14 at 4-5.) Morris failed to offer any evidence, by affidavit or otherwise, to show how he was hindered in pursuing his legal claims by the defendants' actions regarding photocopies. The Court does not find a genuine issue of material fact for trial on this issue and will grant defendants' motions for summary judgment as to Morris' claim regarding photocopies.

D.     Legal Mail Claims

Scholl contends he has filed many complaints and grievances about Officer Dean and Mrs. Cox or others for repeatedly opening his legal mail outside of his presence. Scholl did not name either of these individuals as defendants herein. Scholl does not state any allegations against any of the named defendants regarding the opening of his legal mail. (CIV 98-4068, Doc. 1 at 9.) Scholl acknowledge SDSP's policy regarding the opening of legal mail is that it shall be done in the presence of the inmate. (Doc. 42 at 11.) No genuine issue of material fact remains for trial regarding Scholl's claim that his legal mail has been opened outside of his presence.

Although Morris states in his brief in opposition to the defendants' summary judgment motion that he claims his incoming legal mail has been opened and inspected outside of his presence (Doc. 42 at 11), the Court finds no such allegation in either Morris' pro se complaint (Doc. 1) or in his Amended Complaint (Doc. 14.) Therefore, Morris is not entitled to relief on any claim that his legal mail was opened outside of his presence.

E.     Medical Co-Payment

Scholl contends SDSP's policy requiring inmates to make a payment of $2.00 for certain medical visits constitutes deliberate indifference to inmates' serious medical needs in violation of the Eighth Amendment. (CIV 98-4068, Doc. 1 at 6.) Scholl does not allege he has been denied medical care or that defendants have disregarded any serious medical

24

need because he is unable to pay the $2.00 co-payment. Rather, the medical co-payment policy specifically states "[m]edical care will never be refused to any inmate. Those inmates who do not have any money in their account will be seen by Medical Staff, and a negative balance will be placed on their Inmate Institutional Account." (Doc. 36, Exhibit G at 3.) Inmates are allowed to show a negative balance in their inmate account due to a deduction of medical co-payments. (Id.) No genuine issue of material fact remains for trial regarding Scholl's claim that the medical co-payment amounts to cruel and unusual punishment in violation of the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 102-03 (1976) (holding that deliberate indifference to the serious medical needs of a prisoner constitutes cruel and unusual punishment); Farmer v. Brennan, 511 U.S. 825, 837 (1994) (explaining that a prison official exhibits deliberate indifference when the official actually "knows of and disregards" a prisoner's serious medical needs); Reynolds v. Wagner, 128 F.3d 166, 172-79 (3rd Cir. 1997) (holding a prison policy imposing a medical co-payment for certain medical care sought by inmates does not amount to cruel and unusual punishment and citing several cases finding similar medical co-payment policies constitutional).

Scholl also contends the medical co-payment violates his right of access to the courts because he is forced to choose between purchasing medical care and purchasing legal supplies. He cites Gluth v. Kangas, 951 F.2d 1504 (9th Cir. 1991) in support of this claim. Gluth involved an inmate's challenge to a prison's indigence policy which, according to the uncontroverted facts in that case, forced inmates to choose between purchasing hygienic supplies and essential legal supplies.[3] Id. at 1508. Scholl's claim that he is forced to choose between medical care and purchasing legal supplies is defeated by the Prisoner Trust Account Report form submitted in support of his motion to proceed in forma pauperis in CIV 98-4068. (CIV 98-4068, Doc. 3.) This report shows Scholl was allowed to receive legal copies although he had a negative balance in his prison trust account. (Id.) The average monthly balance of Scholl's prison trust account for the six-month period of October 1997

---

[3]But see, Scott v. Angelone, 771 F.Supp. 1064 (D.Nev. 1991), aff'd, 980 F.2d 738 (9th Cir. 1992) (unpublished) (holding that a prison policy requiring inmates to pay a $4.00 co-payment for certain medical services did not violated the inmates' due process rights under the Fourteenth Amendment).

to March 1998 was negative $185.25. (Id.) During that same six-month period Scholl's account shows charges in the total amount of $57.50 for copies and net charges in the total amount of $2.00 for medical co-payments. (Id.) Scholl has not produced any evidence that he has been forced to choose between purchasing medical care and purchasing legal supplies. Therefore, defendants are entitled to summary judgment on Scholl's claim regarding the medical co-payment. See Reynolds, 128 F.3d at 182-83 (holding a prison policy imposing a co-payment on inmates for certain medical services did not violate the plaintiff inmates' right of access to the courts where there was no evidence of actual or imminent interference with access to the courts).

F.     Inmate Accounts and Financial Responsibility

        Scholl alleges SDDOC Policy Number 1B.10 violates various constitutional rights. Under Policy 1B.10 the first $100 of an inmate's incoming money is placed into the inmate's commissary account. (Doc. 36, Exhibit H at 2.) The inmate may then spend up to $25.00 per week from the commissary account for purchases in the commissary. (Id.) Any amount in excess of the initial $100 figure placed in the commissary account is divided equally between two other accounts: one-half is placed in the inmate's savings account; one-half is applied toward an inmate's fines, court-ordered restitution or other financial obligations such as familial support, or, if no such obligations exist, it is applied to defray the inmate's costs of incarceration. (Id.)

        Scholl contends Policy 1B.10 forces him to choose between necessary medical care, hygiene supplies, legal supplies and court filing fees which impedes his access to the courts. This argument fails for the same reason stated above in connection with the medical co-payment claim. Scholl has produced no evidence that he has been forced to choose between the listed items because he has been allowed to maintain a negative balance in his inmate trust account. Scholl has not alleged he has been disciplined for maintaining a negative balance in his inmate trust account.

        Although Scholl contends his constitutional rights are being violated by Policy 1B.10 because it requires him to pay for the cost of his incarceration, Scholl has produced no evidence to show a deduction has actually been made from his inmate account for such expenses. The Inmate Trust Account Report form submitted by Scholl in support of his

26

motion to proceed in forma pauperis in CIV 98-4068 does not show a deduction for cost of incarceration. (CIV 98-4068, Doc. 3.) Rather, Scholl maintained a negative balance in his inmate account for the entire six-month period before the filing of his complaint in CIV 98-4068. The Court finds no genuine issue of material fact exists for trial that Scholl's constitutional rights have been violated by Policy 1B.10.

G.    Retaliation

An inmate has a cause of action for retaliation when the inmate "alleges that prison officials filed disciplinary charges based upon false allegations against the prisoner in retaliation for the prisoner's participation in grievances against prison officials." Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994) (citing Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993), cert. denied, 512 U.S. 1209 (1994)), cert. denied, 515 U.S. 1145 (1995).

"Although a prisoner enjoys no constitutional right to remain at a particular institution, and although generally prison officials may transfer a prisoner for whatever reason or no reason at all, a prisoner cannot be transferred in retaliation for the exercise of a constitutional right." Goff, 7 F.3d at 737 (internal quotations and citations omitted). To prevail on a Section 1983 retaliatory transfer claim, an inmate must prove the actual motivating factor behind the transfer was a desire to retaliate. Id. In other words, an inmate must prove that but for his legal actions against the prison, he would not have been transferred to another prison. Id.

1.  Neal Morris

Morris states in his Amended Complaint that "he fears reprisal from the Defendants for commencing this action and has been retaliated against in the form of repeated 'shake downs' intended to harass and intimidate him." (Doc. 14 at 4.) Other than this statement in his Amended Complaint, Morris does not state any specific facts showing he has been subjected to repeated shake downs or that such shake downs were actually motivated by a desire to retaliate for the filing of the present action. He does not allege who performed such shake downs or how many shake downs were made of his cell. Morris states in his brief in opposition to the summary judgment motion that he was transferred from the minimum security cottage to the maximum security Jameson Unit for over three months for smoking a cigarette, the standard penalty for which is a two-week cell restriction. (Doc. 42 at 11.)

Morris also states in his brief he has been denied adequate medical assistance for a severe back injury and because he filed this action he has been denied adequate legal assistance respecting other matters. (Id.) Morris did not incorporate these statements in his affidavit, Doc. 43, or otherwise state under oath he would testify to these allegations if he is called as a witness at trial herein.

Even if Morris had incorporated into his affidavit the statements in his brief regarding alleged retaliatory conduct, he could not survive summary judgment on the retaliation claim. The Eighth Circuit recently reaffirmed its prior holding that "an inmate may not state a claim of retaliation where the 'discipline [was] imparted for acts that a prisoner was not entitled to perform.'" Cowans v. Warren, 150 F.3d 910, 912 (8th Cir. 1998) (quoting Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990)). Morris does not assert he did not smoke a cigarette, or that he was entitled to smoke a cigarette. Therefore, Morris cannot state a claim of retaliation based upon the discipline imposed for smoking a cigarette. Morris does not provide any specific facts regarding whether he has actually been denied adequate medical assistance, whether any of the defendants herein have any involvement in the provision of medical assistance to defendant, or whether any such denial is based upon a desire to retaliate against Morris for filing the present case. Regarding Morris' claim that he is suffering retaliation by not being allowed access to the contract attorneys, the Rules of Professional Conduct and the contract attorneys' contracts with the SDDOC prohibit them from providing advice to Morris. South Dakota Rules of Professional Conduct, SDCL Ch. 16-18, Appx. Rule 1.7; Doc. 36, Exhibit A at 0065, 0076 and 0087. The Court concludes the record taken as a whole could not lead a rational trier of fact to find for Morris on his retaliation claim and, therefore, there is no genuine issue of material fact for trial. Matsushita , 475 U.S. at 587.

### 2.  Charles Scholl

In his brief in opposition to defendants' summary judgment motion, the acts of retaliation alleged by Scholl for filing the present action are that he was denied visits with his common-law wife and stepdaughters, was denied adequate medical care for his serious back injury and has been completely cut off from any contact with the inmate legal advisors. Regarding Scholl's grievance that his common-law wife and stepdaughters were taken off

his visit list, the Grievance Board responded on April 24, 1996 stating that the "family members" removed from his visit list were actually his girlfriend and her children. (Doc. 46, Exhibit 16 at 2100.) It is clear Scholl was denied visits with his claimed common-law wife and stepdaughters approximately two years before he filed the present action on April 20, 1998.  Therefore, the denial of such visits cannot be the basis for stating a claim for retaliation for filing the present action.

Scholl claims he has suffered retaliation for filing the present action in the form of inadequate medical care.  The medical records submitted by Scholl, however, pre-date the filing of the present action. (Doc. 46, Exhibit 15.)  Scholl does not state any other specific facts to support his claim of retaliation by the denial of adequate medical care.

Scholl claims he has suffered retaliation for filing the present suit because he is being denied access to the contract attorneys.  Delaney first informed Scholl he would no longer have contact with Scholl on March 20, 1998, after Delaney learned Scholl had filed a grievance against Delaney with the State Bar of South Dakota. (Doc. 46, Exhibit 6.)  This action was taken approximately one month before Scholl filed the present action.  Therefore, Delaney's action cannot form the basis for a claim of retaliation for filing the present case. Moreover, the Rules of Professional Conduct and Delaney's contract with the SDDOC do not allow Delaney to provide advice to Scholl during the pendency of the present action due to the obvious conflict of interest.  South Dakota Rules of Professional Conduct, SDCL Ch. 16-18, Appx. Rule 1.7; Doc. 36, Exhibit A at 0076.  The Court concludes the record taken as a whole could not lead a rational trier of fact to find for Scholl on his retaliation claim and, therefore, no genuine issue of material fact exists for trial. Matsushita , 475 U.S. at 587.

### 3.  Larry Eaton

In retaliation for Eaton's efforts to assist other inmates with their litigation and for commencing suit attacking his own sentence, Eaton alleges he was "subjected to solitary confinement many times, then transferred from Springfield to Sioux Falls, and his word processor, law books and office supplies were seized and returned to [his] relatives in Michigan." (CIV 97-4015, Doc. 25 at 3.)  Eaton contends defendants Dooley and Slykhuis arranged for his transfer to SDSP based upon the pretext that Eaton was planning an escape.

Eaton contends there was no reliable or sufficient evidence to substantiate the allegation that he was planning an escape.

The law is clearly established that even if Eaton was transferred to SDSP "because he provided legal assistance to his fellow inmates, this would not constitute the violation of a protected right." Gassler v. Rayl, 862 F.2d 706, 708 (8th Cir. 1988). The Eighth Circuit followed Gassler, in Williams v. Nix, 1 F.3d 712, 717 (8th Cir. 1993), by holding that an inmate's transfer to a different institution, whether or not motivated by such inmate's lawyering activities, did not violate his constitutional rights. Therefore, even if Eaton could establish defendants Dooley and Slykhuis arranged for his transfer to SDSP in retaliation for Eaton's lawyering activities, he does not state a violation of his constitutional rights and these defendants are entitled to summary judgment on this issue.

Eaton also contends he was transferred to SDSP in retaliation for commencing litigation challenging his conviction. "In raising a retaliatory transfer claim, the prisoner must face a substantial burden in attempting to prove that the actual motivating factor for his transfer was the impermissible retaliation." Goff, 7 F.3d at 737 (citation and internal quotation omitted). Eaton must prove the transfer would not have been made "but for" his litigation activities. Id. "Finding that an impermissible retaliatory motive was a *factor* is insufficient to establish a claim in a prisoner retaliatory transfer case." Id. at 738. The record shows the issue of Eaton planning an escape was first reported by inmate Mark Guyot and investigated by Case Manager Doug Wynia on March 19, 1996. (Doc. 46, Exhibit 10 at 1011 and 2122.) Eaton does not allege any of the defendants were involved in the initial reporting and investigating of a potential escape. Wynia concluded after his investigation that the informant's information regarding Eaton's escape plans should be regarded as true and correct. (Id. at 2122.) The record herein clearly supports the conclusion that the decision to transfer Eaton to the SDSP was based upon the documented escape risk posed by Eaton. Eaton has not specified any facts, by affidavit or otherwise, which creates a genuine issue of material fact for trial supporting his claim that his transfer to SDSP would not have been made but for his commencing litigation challenging his conviction.

Eaton has not provided any specific facts regarding his claim of retaliation by being subjected to solitary confinement "many times." Eaton did not submit disciplinary records

30

showing how many times he was placed in solitary confinement or the reasons for such placement.  If Eaton was placed in solitary confinement for performing acts he was not entitled to perform, he does not state a claim for retaliation.  Cowans, 150 F.3d at 912.  The record taken as a whole could not lead a rational trier of fact to find for Eaton on his retaliation claim regarding placement in solitary confinement and, therefore, no genuine issue of material fact remains for trial on this claim.  See Matsushita, 475 U.S. at 587.

Eaton alleges defendants have retaliated against him by seizing his word processor, law books and office supplies.  Under SDDOC Operations Memorandum # 2-9, inmates are allowed to possess a typewriter as long as it does not have any memory.  (Schiefen Depo., Doc. 36, Exhibit B at 22; Doc. 36, Exhibit A at 2124-34.)  Under this same memorandum, inmates are allowed to possess legal publications and office supplies to the extent such property physically fits in the inmate's property container, which is approximately the size of a milk crate. (Schiefen Depo., Doc. 36, Exhibit B at 23.)  Therefore, defendants' actions in removing Eaton's word processor, law books and offices supplies were motivated by SDDOC policy.  The Court does not find the existence of a genuine issue of material fact for trial regarding Eaton's retaliation claim involving deprivation of his word processor, law books and office supplies.

### III.  Conclusion

Defendants are entitled to summary judgment on all of Eaton's claims.  Defendants are also entitled to summary judgment in their individual capacities on Morris' and Scholl's claims for damages based upon a violation of their constitutional right of access to the courts. The Court will not grant defendants' motions for summary judgment in their official capacities on Morris' and Scholl's claims for violation of their constitutional rights of access to the courts, including Scholl's claim regarding legal photocopies.  Summary judgment will be entered in favor of defendants on Morris' claim regarding legal photocopies and on Scholl's claims regarding the opening of his legal mail, the inmate medical co-payment and the inmate accounts and financial responsibility policy.   The Court will also grant defendants' motions for summary judgment on Morris' and Scholl's claims for retaliation. Therefore, remaining for trial herein are Morris' and Scholl's declaratory and injunctive claims against defendants in their official capacities for the alleged violation of Morris' and

Scholl's constitutional rights of access to the courts, including Scholl's claim regarding legal photocopies. Because only equitable remedies remain available to plaintiffs, neither plaintiffs nor defendants are entitled to a jury trial herein. The Court will, therefore, conduct a court trial beginning on May 18, 1999 at 9:00 a.m.

Accordingly,

IT IS ORDERED:

(1)    that defendants' Motions for Summary Judgment, Docs. 34 and 50 are granted as to all claims asserted by plaintiff Larry Eaton in CIV 97-4015.

(2)    that the defendants' Motions for Summary Judgment, Docs. 34 and 50, are granted, on the basis of qualified immunity, as to Neal Morris' claim in CIV 98-4118 and Charles Scholl's claim in CIV 98-4068 for violation of their rights of access to the courts against the defendants in their individual capacities. The motions are denied as to Neal Morris' and Charles Scholl's claims for violation of their rights of access to the courts against the defendants in their official capacities.

(3)    that the defendants' Motions for Summary Judgment, Docs. 34 and 50, are granted, on the basis of qualified immunity, as to Charles Scholl's claim regarding legal photocopies in defendants' individual capacities and are denied as to this claim in defendants' official capacities.

(4)    that the defendants' Motions for Summary Judgment, Docs. 34 and 50, are granted as to Neal Morris' claim regarding legal photocopies.

(5)    that the defendants' Motions for Summary Judgment, Docs. 34 and 50, are granted as to Charles Scholl's claims regarding the opening of his legal mail, the inmate medical co-payment and the inmate accounts and financial responsibility policy.

(6)    that the defendants' Motions for Summary Judgment, Docs. 34 and 50, are granted as to Neal Morris' and Charles Scholl's claims for retaliation.

(7)    that the Court will conduct a court trial beginning May 18, 1999 at 9:00 a.m. on Neal Morris' and Charles Scholl's declaratory and injunctive claims against defendants in their official capacities for the alleged violation of their constitutional rights of access to the courts, including Charles Scholl's claim regarding legal photocopies.

Dated this _____ day of May, 1999.

BY THE COURT:

Lawrence L. Piersol
Chief Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
(SEAL)              DEPUTY

33